Thank you. Good morning, Your Honors. This case turns on claim construction, and specifically the meaning of one variable, R4, used twice. The District Court got it right in holding that the plain meaning supports identical R4 groups. The Court erred, however, in further holding that applicants changed the plain meaning. To the contrary, the intrinsic record supports the plain meaning that R4 is the same element. Mr. Addy, I take it that it is not a matter of dispute that the fourth compound described in Claim 10, or cited in Claim 10, is in fact the metaprost, correct? That's correct, Your Honor. So this is not, it strikes me, and you can tell me if I'm off base here, this does not strike me as the kind of case in which we have a generic term, in this case let's say R4, and then unspecific elements under that generic term. We have the very item that is in suit, the metaprost, which is called out specifically as being one of the components described by the R4 squared radical. So it seems to me that this is more like a case, not so much an own lexicographer case, but rather a case like this. Suppose you had a claim in which the preamble said one of a group of stockings, let's say, and it describes two pair of women's hose, let's say, and three pair of men's socks. One of which would be the very type of sock that is an issue in the case, let's say a reinforced heel and toe sock. It would be, it seems to me, quite strange to say, well, stockings as a matter of ordinary, a person of ordinary skill in the hosiery art would call stockings limited to hose and excluding socks. And then to conclude, therefore, the very sock that is called out in the claim is outside the scope of the claim. So why isn't the fact that the metaprost is specifically called out the end of the matter? Because, Your Honor, this case is a little different. The metaprost is called out in Dependent Claim 10. There is nowhere that Dependent Claim 10 or any of the other Dependent Claims or the Independent Claim or the specification links the metaprost to R4. And in particular, in Independent Claim 5, the patentee tells you exactly what R4 means. Isn't Judge Bryson right that we would have a case where the preferred embodiment wouldn't be covered by the claims because it has the different R4 groups, ethyl and hydrogen? Well, Your Honor, in this case, the preferred embodiments are not the metaprost. And you can look to the patent at A45 where it defines what R4 is. At the top of A46, it tells you what the preferred representatives are. And then in the next paragraph, it says other compounds may be used. The metaprost is one in a laundry list of those compounds. And it doesn't link R4 at all to the compound metaprost. But then when you get to the claim, it specifically calls out a metaprost. So isn't it even stronger than a preferred embodiment? A preferred embodiment is something that shows up somewhere in the specification. You say, aha, that's identified as a preferred embodiment. So there's a strong presumption that it is incorporated within the scope of the claim. But here, it's specifically called out as being part of the claim. It seems to me that's even stronger than the preferred embodiment type case, isn't it? But, Your Honor, in this case, it may be called out in the dependent claim. But they have to do it right. And it boils down to the fact that they defined R4 in the independent claim to be R4 is. And that definition of R4 is selected from the group consisting of, as you know, is a marquoise group, means it can only be one thing. And then it says, we're going to use that one thing twice. And it goes down to dependent claim 10, where it calls out the metaprost as one of the compounds that you can select. But that would mean that you're— To a chemist, wouldn't the R4 discussed in claim 9, they'll be—the R4 in claim 9 be what is discussed in claim 10? Well, Your Honor, one of skill in the art would believe R4 to be the same. And there was testimony from Allergan's witness that said that the most he could give it was ambiguous. And that's certainly not a clear definition of what R4 is. In fact, when the patentee wanted to claim the metaprost specifically, they did that. And that was the 649 patent. It's expired. Claim 1, the patentee set forth wherein the compound is, the metaprost. And, not surprisingly, didn't use the R4 terminology at all. Let's talk a little bit about the testimony by that witness. You get pages 59 and 60 of the opening brief that says, discussing those of skill in the art, it says that Dr. McDonald agreed that it was known that esters and amides could be used to make prodrugs because they metabolize in the body into the desired active compound. Dr. McDonald specifically said that the half-life of an amide in water is approximately 500 years. And the prodrug approach relies on efficient conversion of the prodrug into the drug. 500-year half-life is not efficient conversion. Now, how do you get a, I know you can say, well, what's in the eyeball isn't water. It has other compounds in it. But, nevertheless, how do you get him saying that when he doesn't? Well, Your Honor, Dr. McDonald does say that, at 2084 of the record, that amides and esters hydrolyze. And there's no dispute that the metaprost does hydrolyze to some extent. Well, yeah, but he says over and over again that a simple amide is very stable. And I think the 500 is something like 1,000 times as stable as the ester, right? And the 500-year half-life that Judge Walloff was referring to is, with references, I understood Dr. McDonald's testimony. Was it McDonald or Garst? I guess it was McDonald. But Dr. Walloff's testimony was that this is why no one would use the amide as a prodrug, the simple amide as a prodrug, as opposed, perhaps, to the peptides or other amides, right? Well, you have to look at the testimony, you have to look at what's at issue here for obviousness. And when you look at the claim at issue, when you look at, basically, what it boils down to, there are only really three facts at issue. And I realize you can't weigh the facts of what Dr. McDonald said, but the three facts that are at issue for obviousness are not disputed, and those are as follows. The method of treating is set forth explicitly in the Pharmacia patent. That's at 3342, and we compare it with the claim at Blue Brief 65. Pharmacia specifically told the world that compound 2 was the compound you wanted to use. It told that at Arvo, and Allergan reflected that in its memo back at A3358. So the only change that you have to make from compound 2 is to use an amide instead of an ester, and it was known in the art that both of them mask the acid. Mitra said it's basic chemistry, but we can't use him. McDonald said it's routine to do this. Well, now, McDonald said, and it seems to me there's an important point. McDonald said it's routine to do this. What he said it was routine to do was to do the synthesis of the amide. That's clear. But he didn't say that it is a matter that one would be motivated or have any reason to do. He said just the opposite. He said because you would never use an amide as the prodrug in place of the ester for the reasons, again, that Judge Wallace referred to. Isn't that the problem that you have is that you've got evidence, uncontradicted really, that the simple amide is not either suitable for or something that a person of skill in the art would go to as a prodrug for compound 2? But, Your Honor, it's not uncontradicted because Leon Bungard, an exemplary college textbook, shows that one of skill in the art would know esters and amides, and it sets forth both esters and amides right together at 2630. This is the table, right? Yes. Right, and there's no elaboration on the reference. It's just a simple reference to an amide, but it doesn't say anything about simple amides, right? I mean, if I recall McDonald and Garth's testimony, they both say, well, you know, it's not limited to simple amides. Therefore, we can include the more complex and, therefore, more readily metabolizable forms. And then it strikes me, in addition, that if anything, that Leon Bungard suggests the contrary because at 3265, they say, an oscillation of amines to give amide prodrugs has been used only to a limited extent owing to the relative stability of amides in vivo. So that seems to be suggesting almost a teaching away, that these things are stable. Don't use them as prodrugs, right? But it also says they've been used. They've been used to a limited extent. It doesn't say don't use them, but in addition, even if you take Leon Bungard, which is a textbook on the ocular delivery of prodrugs, so it's specifically right on point, but even if you take it for teaching away, there's still JP636. JP636 did it many years earlier with the same ethyl amide. But JP636 was not the, that was just for the compound. It wasn't having anything to do with treatment of glaucoma, right? It does say at the end of JP636 that this compound will have hypotensive effects. So it tells the one of skill of the arts that this compound will reduce pressure. But not, there was nothing about intraocular pressure, right? I mean, it was, there's all sorts of hypotensive effects, right, of these compounds and not just with respect to the specific chemistry of the eye, as I understand it. Leon Bungard, specific to the eye, JP636, hypotensive effects. It's very, very close. And Pharmacia says so in its Stern Chance patent. It says at A3357, it is most reasonable to assume that other prostaglandins exhibit essentially the same properties as PGF2-alpha with the modified omega chain, i.e. IOP lowering effects without side effects. Now what do you say to the point made by your opposing counsel that Dr. Mitra, in his conclusion in which he lays out his reasons for finding that the patent is obvious, or would have been obvious, does not even mention Leon Bungard? It's crazy, Your Honor. Dr. Mitra talks about masking the C1MI. I'm not sure what the it is. Is the assertion crazy, or was it crazy for Dr. Mitra not to mention Leon Bungard? I'm sorry, Your Honor. Dr. Mitra, first of all, he did mention Leon Bungard. Well, he does testify about Leon Bungard, but when he gets to his conclusion, I don't think he mentions it, right, in his final conclusion? He mentions the masking of the C1MI, which is what Leon Bungard is illustrative to show. And that's what the whole case was about, using either an amide or an ester at the C1 position to mask the acid. Well, Dr. Mitra, the judge summarized Dr. Mitra's credibility as eviscerated, which, given the fact that he contradicted his own testimony and published opinion, didn't seem to me to be unfair. How do you deal with that? Well, we didn't appeal the judge's ruling because it was a credibility ruling. It's unfortunate because these issues were not the main issues on obviousness, and again, when you look at the three operative facts that have to do with obviousness, they are undisputed. It's the method, which is in stern chance, the compound two, told by Pharmacia to use it, and the fact that it was replete in the art that esters and amides would hydrolyze and mask the C1 acid. Could you just briefly address the Maddox reference, which seems to teach away saying that amides are antagonists, not agonists? That's what Dr. Garst interpreted it as, but I believe that you can look at it as having the same effects as the agonist, and if anything, Your Honor, it teaches to use an amide in that position, and that's what's important about Maddox. Your Honor, if you have no more questions about claim construction, I'll reserve. Okay, thank you. Thank you. Could I ask a question and not use up any more of your time? Just fine, the clock's off, go ahead. This is really just a kind of housekeeping question, but just to make sure, the chemistry is difficult enough, but I just want to make sure that I've not misread something in the judge's opinion, so I'm looking for help from either or both of you on this. There are two things that left me a little confused when I read them, and they're on pages 26 and 27 of the appendix. At the bottom, at the very last two lines of page 26 in the text, she says, compound 2 is an isopropyl ester that converts into bimatoproste upon hydrolysis. She means bimatoproste-free acid, right? Yes, sir, she does. So that's a typo or whatever? Yes, sir. Okay, thank you. Moving on to the next question, on the next page, she says that the structural difference between compound 17, bimatoproste-free acid, and bimatoproste is, again, the functional group at the C1 position. Bimatoproste has an ethyl amine. She means an ethyl amide, doesn't she? Yes, she does. Okay, thank you. Thank you, Your Honor. Mr. Singer, we started the clock for Ms. Addy a little late, so we're going to give you an extra two minutes to make sure the time is even. Very well, thank you. And may it please the Court. One second. The clock needs to go the other way. There we go. You may now start. I didn't see that. You're in charge. You can do what you want. Please begin. I want to start with claim construction, just briefly, because I think this is a good case where labels have, at some level, subsumed the debate. What's plain meaning? What's ordinary meaning? What's lexicography? The key issue is when you look at the intrinsic record, what the inventors claimed in Claim 10, Bimatoproste, is supported by the claims, right, construing it that way, as well as the specification. And there really isn't any substantive or substantial intrinsic evidence going against the claim construction that Judge Robinson got, which is what she noted in her opinion, that the defendants had not pointed out substantial or significant intrinsic evidence suggesting that the, quote, plain meaning that their expert proffered should be used. The district court discussed the lexicographer rule. She did. What she meant to say was the patent described the invention in the claim, right? Right. Defined it in the claim, which is what claims do. Right. That isn't really the lexicographer rule. In fairness to Judge Robinson, I think what she was trying to get at was the intrinsic evidence was different than the plain meaning that was proffered by the expert. And, therefore, she went to lexicography, but clearly the claims are what she's getting at. The key point, as you say, Judge Rader, was she focused on the claims and Claim 10 being dependent. And, you know, that's really, to me, you know, there isn't any substantial intrinsic evidence going against that. Unless the court has questions about that, I'll address the obviousness issues raised. I will simply point out additionally, which was not pointed out, is this is not a laundry list of compounds in the specification. If that's a laundry list, it's a pretty short laundry list. And the five compounds in the list at table, excuse me, at column seven, those are the identical five amide compounds claimed in Claim 10. So what we have is consistency from the specification saying these are amide compounds you can use in the invention, and then we have them right there in Claim 10. And the NR42 is about seven or eight lines before that list of compounds, and it says that those compounds are compounds of the, quote, invention. I think that's very clear. That's what Judge Robinson focused on, that and the dependent claims. As to obviousness, it was said there were three things and they weren't disputed. Not surprisingly, I don't agree with that. I will agree that the Stern Chance patent, just so there's no confusion, that's the Pharmacia patent that Ms. Addy talked about, which Judge Robinson referred to as the Stern Chance patent, did teach a method of treating glaucoma. But compound two, which was offered as the most effective, that was actually disputed by Dr. Mitra. Dr. Mitra himself, in the Canadian litigation, said that the data from the compounds wasn't enough to be different from statistical significance, that one couldn't necessarily tell from the data in Stern Chance that it lowered IOP. But more important than that is this third point, that the prior art is somehow replete with information that amides hydrolyze. Well, remind me, on Stern Chance, there's so many numbers floating around here that it's a little hard to keep them straight, but Stern Chance compounds two and 17, was that the other compound of interest? And nine. Nine is latanopros, so that's the xalatam. Latanpro. Well, that's the one that ultimately was commercial. That's right. But 17, what was the difference again between two and 17? So two is the methyl ester, or the isopropyl ester, I think, if I remember correctly, one of the two. Right. It's an ester of the free acid. But 17 is the free acid, what we've come to call the metapros free acid. That's right. You don't like that term. In hindsight. Right. All right. But that, okay, so 17, there's no question that 17 is effective, right? Well, that's the question. Except for the side effects. The question is whether the data, it lowers IOP. Right. The data in there says it lowers IOP. Right. The question is whether the data in, according to their expert, whether the data in the patent is different enough from statistical significance to show an effective IOP lower. But has it been proven that the metapros free acid, as it were, or is there some other reference that they're relying on? No. They were relying on Stern Chance, and Dr. Mietra's testimony about Stern Chance was that the IOP lowering data was within the zone of statistical significance. And then he admitted, Judge Bryson, later on, that they had to do a full clinical trial of latanoprost to show that it actually effectively lowered IOP. But, you know, more important than that, and that really goes to Dr. Mietra's credibility, the fact that he would take one position in one litigation and another in another, was the prior art is replete, I think I heard counsel say, with information about the hydrolysis of amides. I heard that. It's certainly replete about the hydrolysis of esters. But the prior art is virtually silent about any hydrolysis of amides. Putting aside the waiver issues, the Lee and Bungai reference, I think the reason it wasn't relied on is because it effectively teaches away from using amides. It doesn't specifically mention a single thing. I'm sort of curious. Dr. Mietra did testify, and not at great length, but for a couple of pages about Lee and Bungai. He did. And he referenced it among his prior art that he had looked at and considered and so forth. He did. And it does have the word amide sitting there right in the middle of the table. Right. And so why isn't that at least enough to direct a person of ordinary skill in the art to try? There's two basic reasons. One, we have to get to whether or not you're interested in making a prodrug, which was a heavily disputed issue. Was bimatoproste a prodrug or not? But secondarily, even if you are interested in making a prodrug, the whole ballgame is the rate and extent of hydrolysis. That's the issue. And as you pointed out, and as he was consistent in his testimony, simple amides are, as Lee and Bungai said, they're stable in vivo. They don't hydrolyze very well. And there's no real good reason to create a simple amide prodrug because the whole idea is to have something that hydrolyzes efficiently. Bimatoproste, the isopropyl ester, that lowered IOP and reduced side effects through a rapid, rapid hydrolysis. Bimatoproste works differently. And ironically, we have here a claim how this was so obvious you should just do this. Bimatoproste, the record shows, has much worse side effects in terms of hyperemia than the latanoproste isopropyl ester. So if it was a prodrug, we didn't do a very good job at doing it. So I think that is really the key point of the three that are disputed. The first one I will grant that there's a method there. Now, there's a question I have about the process that the district court employed in analyzing the consequences of Mitra's, her rejecting Mitra's testimony. She says that once you get rid of Mitra, you really don't have anything left. Now, the opposing counsel says, but there's a lot left because there are a number of references, evidence of those references, which are sufficient at least to support a conclusion of obviousness. And that the district court, and here's the critical point in the argument, as I understand it, the district court predetermined any discussion of the merits by saying, well, that was not Barr's theory going in. But it strikes me that Barr at least, their theory was at least Stern-Champ and various other references that Mitra referred to, right? Which included JT 636. I mean, at the conclusion of his testimony, he lays out everything except, interestingly, Lee and Bungard. A significant omission perhaps, but he lays out each of the other references. I think Ho, 636, Stern-Champ, and there was one other. Bito. Bito, of course. So why is it she's wrong in saying that this was just a one reference obviousness case? Well, first off, I think you have to look at her opinion closely, Judge Bryce, because she did consider those other references. She mentioned them, talks about that Mitra, A34 in her opinion. She talks about the other combination, the other references that Dr. Mitra employed. And what she says is, right, Mitra cited additional prior art in support of his opinion. One such reference was JP 536. And the court does not recant each of the additional references here. It is sufficient to state that none of the additional references were asserted. Right? And then she goes on and says, in summing up, right? But when she said none of the additional references were asserted, isn't she saying that I read her to be saying that these references were mentioned, but not asserted as a basis for obviousness? Not as primary references, right? If they were used at all, they were used in combination with Stern Chance. But she does go on to say, Judge, that he asserted its obvious in view of Stern Chance, Bito, JP 636, and Hope. So she actually does go through his summation at the end of the four references that he relied on. And as to her digging through the record to try to get at other combinations that were not specifically referenced by Dr. Mitra, this court's opinion is Wait, wait, wait. I've lost you here now. Where are you saying, where are you, are you quoting from the very bottom of 33 on to 34? Your Honor, if you look at A34, paragraph 45, right? 45? Mm-hmm. Paragraph 45. Oh, A34. A34, which is page 30 of her opinion. I was looking at 34 of her opinion. That's why I'm off. I'm sorry, I'm sorry. No, no, my problem. Okay, go ahead. In summing up his testimony, however, Mitra stated the asserted claims are obvious in view of four references. Stern Chance, Bito, JP 636, and then the long name of Hope. And so she did consider all four of those that he summed up. But he characterizes his testimony, which, of course, is what he said. But that isn't, it seems to me where the rubber hits the road is back on 39, 38, 38 to 39, where Allergan argues that the defendants waived any obviousness theory that relies on JP 636, or combined Stern Chance with Lee and Bundegard, and she says she agrees. Right. She's saying regardless of what else he may have relied on in his testimony, that wasn't their theory, and therefore it's waived. Isn't that the way you read that? I agree with you as to those two points. Let me be clear about something. The four that we just mentioned relate to the 819 patent. This JP 636 that she's referring to here, that relates to the 649 patent, which is not at issue here. There were three waiver arguments, if you were, two waiver arguments made by Allergan, excuse me, that JP 636, 649 had been waived, and the 649 patent is not at issue. So this sentence here, this is, you can strike that out, and then the specific Stern Chance combination with Lee and Bundegard had never been made by Dr. Meacher. But the four references we went through on page, whatever it was, 834, she did talk about in relation to the fact that Stern Chance, the main reference, the opinion was so incredible, right, or lacked credibility that combining them to do something with Stern Chance was unsupported. And the court's authority has been in complex technology like this, the court can require expert opinion to put together references, and, not insignificantly, she found the expert testimony offered by Allergan credible. And she said she did not detail the pro-validity position, but that she found Allergan's experts credible, who of course testified that those combinations did not render the patent invalid. So she considered the four main references he relied on, she said I don't have to, as I understand it, under the Federal Circuit's authority, try to put this all together myself without expert testimony in a complex case like this, and she found Allergan's experts credible, who testified that the patents were not invalid when you look at the balance of their testimony. I think that's an adequate, there's been no clear error shown in the defendant's brief with those findings, and that's really, if you will, a summary of what Judge Robinson did in her post-trial opinion. So, you know, I've taken less than my time, but I don't have anything further to add unless the court has any specific questions. Thank you. Thank you. Ms. Addy? Ms. Addy, what about what Mr. Singer just said? Do you think expert testimony wasn't essential in this case? Two points, Your Honor. First of all, I think when it boils down to it, the issues remaining for obviousness are pretty basic. It's a known exchange at a C1 position, and there are two options. But, point number two, there was expert testimony, and it did come from their witnesses. So on both points, I think we're in good position. But I was struck by Dr. Garst's comment that when Allergan tested the amides and saw they had a reducing effect on interocular pressure, it was, how did he say it? It was the scientific surprise of his life or his career or something. Isn't that pretty persuasive that you wouldn't head in the amide direction? But they did head in the amide direction, and they did do what they were supposed to do. But it was a surprise. It was unexpected. Isn't that revelatory? Well, their efforts to head in the amide direction were, according to their testimony at least, not with an eye towards seeing if they could create a prodrug, but rather to see if they could create an antagonist, right? But that's what they testified, but none of that matters when it comes down to the obvious effect. Because that would make your answer to Chief Judge Rayburn seem to me less compelling, right? You say, but they did head in that direction. Well, yes, they did, but they headed in that direction, according to their testimony, for a very different reason. They had both a prostaglandin program and this prostamide program, so they were doing it for two reasons. And I believe if you look in the appendix at Volume 3 at 5175, that's part of their prostaglandin program. It went to the prostaglandin team, and they're saying here, hey, let's look at amides. Aren't you giving us a pretty hefty dose of hindsight here? Now that this surprise is no longer surprising, we think it is evidence of obviousness, but it was a surprise. But there's plenty of art out there that says it wasn't a surprise. And I want to address what my colleague said about what was presented at trial. We did present in the joint pre-trial briefing, we presented to the court and to Allergan that we were addressing this very thing, and that's at A980, paragraph 30. In addition, there's multiple prior art that talks about this very thing, and that's in our blue brief, the amide prior art table, facing page 54. That shows the facts that support this theory. And, Your Honor, even if you give them that they were surprised, that Allergan was surprised, there's no testimony that one of skill in the art should be surprised. This is Dr. Garth's testimony. He's an inventor, so you can discredit it. And in addition to that, these are secondary considerations. And when the prima facie case is so strong, as it is here, they can't overcome this case. I wanted to also address some of the claim construction issues. Your Honor, this construction is not the construction of the mattress. It's the construction of R4, and the claim 5 tells you that R4 is selected from the group. And there's nowhere that it tells you now R4 is something else in addition. Go back, if you would, to my hypothetic with the stockings, which for me at least is easier to think about. Would you say in that setting that if a claim said stockings from among the following, and it was clear the judge said that a person of ordinary skill in the art would say stockings mean hoes, it doesn't mean socks, but the five items that are listed under stockings, including one of the following five, was men's socks with reinforced heels. Wouldn't men's socks with reinforced heels be claimed? How is it claimed? How does the applicant state it when it defines the element? It defines the, it says stockings, including the following five, A, B, C, D, E, and the fifth is socks with reinforced heels. It could be, Your Honor. That case is different from what we have here. Here we have a known claiming strategy, Marcouche Groups, where it's understood that you select only one from the group. Okay. You select one. Call it a Marcouche Group of socks. Okay. So let's avoid the Marcouche problem. What I'm trying to get at is if there's some confusion, some lack of clarity, maybe even a mistake with respect to how you characterize the overarching category, it's still perfectly clear that you've claimed the underlying item, right? I disagree. Why? The public notice function of claims requires that you maintain the strict rubric. That's what claims are for. Claims are the explicit things that tell you what's covered. But if a patent lawyer, it seems to me, was to read this claim and say, I don't think it covers the mataprost, even though the mataprost is in there, in hype verba, I don't think it covers the mataprost because, uh-huh, I think we, a person of ordinary skill in the art, would characterize R4 squared as being something that does not include the mataprost, boom, we're done. I think that would be an extraordinarily dangerous path to follow for a patent lawyer advising counsel, don't you? Yes. And here we have more proof that R4 is a single element and it can't be two different things. For example, in the spec, it mirrors claim five's definition of R4, R4 is. It does the same thing in the spec at the bottom of page 46, R4 is. And so if you say that the ordinary plain meaning of R4 is that it can be different things, under Phillips you have to look at how it's used and how it's actually used in the spec is to be the same thing. The fact that it may be listed later, the mataprost is listed later, doesn't change how the applicant defined R4. Concluding thought, Ms. Saddy? Yes, Your Honor. In conclusion, claim construction is clear and it's based on this definition of R4 is. And claim five puts that definition and this case should be reversed. Thank you, Ms. Saddy. Thank you.